# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

SCOTT A. WAY,

    Defendant.

Case No. 3:17-cr-40005-JPG

## MEMORANDUM & ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

This matter comes before the Court on defendant Scott A. Way's motion to suppress evidence (Doc. 28) and motion to suppress statements (Doc. 29). The Government filed a timely response to the motions. (Doc. 38.) The Court held a motion hearing on September 6, 2017. At the conclusion of the hearing, the Court reserved ruling on the matter in order to give the defendant time to file a supplemental brief. The Court gave the defendant 14 days to file the brief after receiving the transcript from the hearing. The defendant received the transcript on October 17, 2017, but has not filed another brief.

## I.  BACKGROUND

The facts of this case focus on two people: defendant Scott Way and his alleged co-conspirator, Natasha Mann. There is a lengthy backstory regarding the purported drug activities of the two, but the relevant facts for the purposes of this motion start on March 17 and 18, 2016: when a U.S. Immigration and Customs Enforcement (ICE) agent notified the Southern Illinois Enforcement Group (SIEG) that ICE had intercepted two packages of MDMA pills at Chicago O'Hare International Airport. Both packages were addressed to Mann.

Following the tip, SIEG agents obtained an anticipatory search warrant of Mann's house. On the morning of March 22, 2016—while the agents were in the final preparation stages to execute the warrant—they learned that the post office had intercepted two more packages of MDMA addressed to Mann. At 10:45 AM that morning, the postal inspector delivered all four of the packages to Mann's mailbox. The agents set up a surveillance perimeter around her residence and waited for Mann to retrieve the packages.

Later that day, Way arrived at Mann's residence in his vehicle. The two left without checking the mailbox. They returned several hours later—around the same time that a school bus dropped off Mann's children—and Way dropped Mann off at her home. Way then departed alone. Four of the surveillance agents—Dill, Kelly, Halliday, and Sneed—followed Way. Agent Dill radioed and asked an Illinois State Police Trooper—Jeremy Wynn—to travel behind the surveillance units in case a traffic stop became necessary and possible.

Three more agents—Blake, Cunningham, and Thompson—remained behind to observe Mann. Mann subsequently removed all four packages from her mailbox, placed them inside her vehicle, and drove away with her children in tow. Curiously, she stopped abruptly in the roadway, and this prompted one of the agents to approach the vehicle and attempt to arrest her. When Mann saw the agent, however, she threw three of the packages out of her car. In a reckless attempt to flee, she then rammed her car directly into the driver's side door of a nearby police cruiser (with her children still in her vehicle) and sped away. The agents lost sight of Mann after attempting to follow her for less than a mile.

Shifting gears: when the agents tailing Way heard about what happened with Mann, they "focused intently on Way's vehicle, hoping that he would commit a traffic violation so that they could stop Way and seek his assistance in apprehending Mann." (Gov.'s Resp. to Def.'s Mot. 8.)

2

The Government next claims that Agent Dill observed Way make an illegal lane change without activating his turn signal. This prompted Agent Dill to ask Trooper Wynn to stop Way. Once Trooper Wynn initiated the traffic stop, Agent Dill left his car and approached the scene.

At the suppression hearing, Agent Dill testified that when he approached Way's vehicle, he could smell the odor of "burnt cannabis" from several feet away. (Tr. 37:19–21.) Agent Dill then asked Way to get out of the car. Agent Dill also testified that he asked Way if he had recently possessed or consumed cannabis. (Tr. 39:4–10.) Way answered "yes"—four hours prior to the traffic stop. *Id.* Agent Dill also claimed that he asked Way whether he had a valid prescription for medical cannabis. (Tr. 39:17–21.) Way replied that he did not. Agent Dill then asked Trooper Wynn to search the vehicle.

In the vehicle, Wynn found a large heat-sealed bag which appeared to contain marijuana wax. (Tr. 39:22–40:6.) The agents also seized an iPhone, a digital scale, a black Samsung cellphone, and $612 in U.S. currency. (Tr. 40:8–18.) Dill then explained to Way that the agents knew of Way's activities with Mann, that they needed his help to set up a meeting with her at the local Dollar General, and that the agents wanted to discuss Way's prior MDMA activities with Mann. (Tr. 40:19–41:9.) After a delay to consider the request, Way agreed to help set up the Dollar General rendezvous and called Mann. Following the call, officers transported Way to the Marion Police Department.

Law enforcement officers interviewed Way twice while he was in custody. The first occurred the day that the agents took Way to the station: March 22, 2017. The Government claims that SIEG Agent Chris Kelly and DEA Special Agent Jeff Konvalinka provided Way with notice of his Miranda rights prior to this interrogation, but the defense contests this: in fact, the Government has been unable to provide a copy of the Miranda warnings and waiver that the

defendant allegedly initialed on this occasion. The second interrogation occurred on March 23 at the Williamson County Jail. The Government did give Way his Miranda rights prior to this interrogation, and the waiver is attached as an exhibit to the Government's response.

During the second interrogation, the agents asked Way to consent to a search of his apartment in Carbondale. He consented. That document is also attached as an exhibit to the Government's response. The Government later seized ten items from the apartment: (1) six heat-sealed bags containing approximately 985.7 grams of marihuana; (2) one plastic bag containing approximately 12.3 grams of suspected "meth/molly"; (3) two bags containing approximately 12.4 grams of suspected cocaine; (4) one $5 bill containing approximately 0.1 gram of suspected cocaine residue; (5) 12 new half-pint mason jars; (6) miscellaneous drug paraphernalia; (7) one new box of FoodSaver brand heat-seal vacuum bags; (8) a FoodSaver brand vacuum-sealer; (9) a Volcano Vaporizer machine in black case; and (10) miscellaneous receipts. (Gov.'s Resp. to Def.'s Mot. 14.)

## II. LEGAL STANDARDS

### A. The Fourth Amendment

The Fourth Amendment to the Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. Where evidence is obtained in violation of this guarantee, the exclusionary rule generally requires the Court to suppress the evidence at a criminal trial where deterring unconstitutional police behavior outweighs its costs. *See Brock v. United States*, 573 F.3d 497, 499–500 (7th Cir. 2009). Generally, "searches conducted outside the judicial process,

without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (footnote omitted); *accord Arizona v. Gant*, 556 U.S. 332, 338 (2009).

    B.    **The Fifth Amendment**

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Self-Incrimination Clause applies to state and local governments through the Fourteenth Amendment Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964). In *Miranda v. Arizona,* 384 U.S. 436, 460–61 (1966), the Supreme Court determined that the rule against self-incrimination attaches during a period of "custodial interrogation". The Supreme Court requires police to comply with certain prophylactic procedures before questioning an individual in custody:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479; *accord Moran v. Burbine,* 475 U.S. 412, 420 (1986); *Dickerson v. United States,* 530 U.S. 428, 435 (2000); *United States v. Snodgrass,* 634 F.3d 324, 327 (7th Cir. 2011). The Miranda requirements are constitutional, not simply an exercise of the Supreme Court's supervisory authority to regulate evidence. *Dickerson,* 530 U.S. at 438, 444.

    *i.*    *Custodial Interrogation*

An individual is "in custody" for *Miranda* purposes when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (per curiam). The determination requires an objective, two-

part inquiry: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995) (internal quotations omitted). Where the defendant is an inmate, he is not "in custody" simply because he is incarcerated. On the contrary, in that situation, the Court must ask, considering the totality of the circumstances, whether a reasonable inmate in the defendant's position would believe the interrogation setting added more restraints to his freedom than those posed by his ordinary incarceration. *United States v. Menzer,* 29 F.3d 1223, 1232 (7th Cir. 1994).

Statements gathered without *Miranda* warnings carry an irrebuttable presumption of involuntariness and are inadmissible in the prosecution's case in chief, even if seemingly voluntarily made by other standards. *Oregon v. Elstad,* 470 U.S. 298, 306 (1985). If a suspect invokes his rights under *Miranda,* he is not subject to further interrogation until counsel is present or until he initiates further discussions. *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981). If a suspect waives his rights after receiving the *Miranda* warnings, however, law enforcement officers are free to question him. *North Carolina v. Butler,* 441 U.S. 369, 372–76 (1979).

## III. ANALYSIS

### A. Evidence

#### i. *The Traffic Stop*

Way first moves to suppress the evidence obtained from his vehicle at the traffic stop: a large heat-sealed bag which contained marijuana wax, an iPhone, a digital scale, a black Samsung cellphone, and $618 in U.S. currency. He argues that the investigative stop violated the Fourth Amendment because the traffic violation did not occur.

First, it is clear that traffic stops are seizures under the Fourth Amendment and are therefore subject to its "reasonableness" requirement. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Possible ulterior motives of the officers making the traffic stop are irrelevant to the Fourth Amendment inquiry so long as there was probable cause to believe the person stopped has violated a traffic law. *Id.* at 813. Moreover, the Court "need only inquire whether the officer had probable cause to believe that a traffic violation occurred," *United States v. Muriel,* 418 F.3d 720, 724 (7th Cir. 2005), not whether a violation *actually* occurred. *United States v. Reaves*, 796 F.3d 738, 741 (7th Cir. 2015).

The Court does not accept Way's argument that the traffic violation did not occur. Agent Dill testified at the suppression hearing that he observed Way "make a lane change from the right lane to the left lane on Route 13 . . . he does not [sic] use his turn signal when he changes lanes". (Tr. 34:20–22.) Pursuant to Illinois law, a driver must use their electric turn signal device when changing lanes. 625 ILCS 5/11-804(d). The agent's ulterior motive of wanting to gain Way's help in apprehending Mann is irrelevant. *Whren*, 517 U.S. at 810. The Court finds Agent Dill's testimony that the traffic violation occurred credible given both the totality of the evidence and Agent Dill's statements and behavior—giving the agents probable cause to stop the vehicle.

### ii. *The Search of the Vehicle*

Next, Way argues that the search of the vehicle was not supported by probable cause and does not fall under any exception to the warrant requirement. This is incorrect. Agent Dill testified that he smelled burned cannabis coming from the vehicle. (Tr. 37:19–21.) For the same reasons stated above, the Court finds Agent Dill's testimony credible. And if Agent Dill smelled

7

burned cannabis, this gave him probable cause and triggered both the "plain view" and automobile exceptions to the warrant requirement.

Under the plain-view doctrine, officers may conduct a warrantless seizure of evidence where three conditions are met: "[f]irst, the officer may not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the item must have been in plain view, and third, its incriminating character must also be immediately apparent." *United States v. Contreras*, 820 F.3d 255, 262 (7th Cir. 2016) (citing *Horton v. California,* 496 U.S. 128, 136 (1990)). The Seventh Circuit, along with other circuits, have extended the "plain view" doctrine to situations where an officer "smells", rather than sees, items of an incriminating character. *See United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir. 2003); *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir. 1998); *United States v. Pierre*, 958 F2d 1304 (5th Cir. 1992). Since (1) the underlying traffic stop was legal; (2) the marijuana gave off a plain smell; and (3) the incriminating nature of the marijuana was immediately apparent (considering Way did not have a medical card), the doctrine applies.

Even if the plain-view doctrine does not apply, the odor of burnt cannabis also triggered the automobile exception to the warrant requirement. Under this exception, police may conduct a warrantless search of an automobile if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). An officer has probable cause when, considering the totality of the circumstances, "a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013) (citation and internal quotation marks omitted). The search may extend to "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U. S. 332, 347 (2009). Here, Way told Agent

Dill before the search that he did not have a valid Illinois Medical Marijuana Card. (Tr. 39:17–21.) Accordingly, a reasonably prudent person would believe that evidence of illegal drug possession would be in the automobile because of the smell of burnt cannabis. *Edwards*, 769 F.3d at 514; *Richards*, 719 F.3d at 754.

### iii. The Search of the Residence

Next, Way argues that the search of his residence violated the Fourth Amendment. First, he argues that the search was a fruit of the poisonous tree because (1) the prior traffic stop and search violated the Fourth Amendment, and (2) the Government violated his *Miranda* rights. This argument fails because the traffic stop and search were valid, as explained above, and his *Miranda* rights were not violated, as explained in Section (III)(B) of this order.

Way's second argument is more intricate: he asserts that his "permission to search" form was defective. While detained at the police station, he signed a "permission to search" form that states: "I, Scott Way, hereby give my consent to Agents of the Southern Illinois Enforcement Group and other officers they may designate to assist them in the search of my residence, business or other real property." The officer obtaining the consent, Agent Chris Kelly, checked the box titled "[a]partment/house" and filled in Way's address as "717 S. University Way" prior to Way signing the form. (Gov.'s Resp. to Def.'s Mot. Ex. E.) Now, Way argues that this search form was defective because his real address is "717 ½, Apartment A"—and thus the search of his premises violated his Fourth Amendment rights. (Tr. 122:12–124:16.)

The Court does not agree. First, these two "different" properties are on the same lot. (Tr. 125:13–15.) Second, Way signed the consent form that clearly designated that lot—717 S. University—as his "[a]partment/[h]ouse". Moreover, this scenario is similar to the good faith exception to the warrant requirement: the officers here acted in good faith and objectively and

9

reasonably relied on Way's signed consent form before searching the premises. *See United States v. Leon,* 468 U.S. 897, 922 (1984). One of the central purposes of the exclusionary rule is to deter police misconduct. *Id.* Invoking the rule here when the SIEG agents acted in good faith on a signed consent form regarding property on the same lot would not achieve the purposes of the rule.

### B. Statements

Way has also moved to suppress three sets of statements for alleged Fifth Amendment violations: (1) his statements and actions at the traffic stop; (2) his statements at the March 22nd interview at the Marion Police Department; and (3) his statements at the March 23rd interview at the Williamson County Jail.

#### i. *Traffic Stop*

First, the defendant argues that the Court should suppress his statements and actions at the traffic stop because he did not receive his *Miranda* warnings. Way argues that any statements or actions he gave in response to questions regarding Mann could be incriminating: for example, these statements could implicate him to be involved in a drug conspiracy with Mann. Accordingly, Way urges the Court to suppress his general cooperation with law enforcement that aided them in apprehending Mann at the Dollar General.

There is no evidence that the agents gave Way his *Miranda* warnings at the traffic stop. Moreover, there is no dispute that the custodial interrogation element was met once the officers found the cannabis wax. (Tr. 142:9–20.) Regardless, even if Way made any statements or actions relating to Mann here that fall within the protections of *Miranda*, his argument fails in the face of the public safety exception. *See New York v. Quarles*, 467 U.S. 649, 657 (1984) ("[w]e conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs

the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.") Agent Dill made his purpose in questioning Way clear: "[m]y absolute focus was on getting Natasha Mann into custody so that we could get her children safe, public safety issue [sic], and my agents and Natasha Mann were at risk." (Tr. 68:13–15.) The Government's interest in finding Mann and rescuing her children—especially after Mann had just rammed her vehicle into a police cruiser with her children in her back seat—outweighs the need for the prophylactic rule. Accordingly, the Court will not suppress Way's cooperation with law enforcement to help apprehend Mann.

### ii. *The March 22nd Interrogation*

Next, Way moves to suppress the statements he made at the March 22nd interview at the Marion Police Department. The parties do not dispute that the officers subjected Way to custodial interrogation: he was in custody at a police station and two law enforcement officials—SIEG Agent Chris Kelly and DEA Agent John Konvalinka—interviewed him regarding his alleged drug activity. The parties do dispute, however, whether the agents Mirandized Way. Way claims he did not receive his *Miranda* warnings, while the agents testified that he did—even though they cannot locate the signed Miranda waiver. Way argues that under the totality of the circumstances—but especially because the Government cannot produce the waiver and because the agents failed to record the interview even though they could have easily done so—the Court should find that Way never received or waived his *Miranda* rights.

The Court disagrees. After hearing agents Kelly and Konvalinka testify at the suppression hearing, the Court finds both witnesses credible given the totality of the evidence and their statements and behavior. Even though the Government has not been able to produce the signed waiver, the Court accepts as true (1) Agent Kelly's testimony that he Mirandized Way before the

March 22nd interrogation and obtained a signed waiver from him (Tr. 85:19–86:14); and (2) Agent Konvalinka's testimony that he observed such an exchange between Agent Kelly and Way (Tr. 128:20–25).

Way also argues that the Court should suppress the statements from the March 22nd interrogation because they violated the voluntariness standard of the Fifth Amendment's Due Process Clause. The Due Process Clause states that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has interpreted this to mean that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (internal quotation marks and citations omitted). Thus, this "coercive government misconduct" may sometimes catalyze involuntary behavior by a defendant. *Id.* Voluntariness is "a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Way argues that the length, duration, and nature of his custody were inherently coercive as applied to a person of Way's education, background, and physical and mental condition, and thus he involuntarily gave the statements at the March 22nd interrogation. During the suppression hearing, one of the witnesses testified that the interview lasted somewhere from an hour to an hour and a half, while the other couldn't specify the exact time frame. (Tr. 150:1–2.) This does not even sniff a violation of the Fifth Amendment's voluntariness standard. Accordingly, Way's argument fails.

    *iii.*    ***The March 23rd Interrogation***

Finally, Way argues that the Court should suppress his statements at the March 23rd interrogation at the Williamson County Jail. This argument fails because the Government has produced the signed waiver form they obtained from Way before that interview. (Gov.'s Resp. to Def.'s Mot. Ex. D.)

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Way's motion to suppress evidence (Doc. 28) and motion to suppress statements (Doc. 29).

**IT IS SO ORDERED.**
**DATED:  November 16, 2017**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
